IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 24, 2012

**CONNIE HUGHES v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Carter County**
**No. S19940      Robert E. Cupp, Judge**

_____

**No. E2011-01118-CCA-R3-PC - Filed April 24, 2012**

_____


A Carter County jury convicted the Petitioner, Connie Hughes, of first degree murder, abuse of a corpse, and forgery under $1000. The trial court sentenced the Defendant to life imprisonment for the first degree murder and to two concurrent one-year sentences on the remaining convictions. The Petitioner appealed her convictions, and this Court affirmed her convictions. *State v. Connie Hughes*, No. E2006-00062-CCA-R3-CD, 2007 WL 1319373, at *1 (Tenn. Crim. App., at Knoxville, May 7, 2007), *perm. app. denied* (Tenn. Sept. 17, 2007). The Petitioner filed a petition for post-conviction relief claiming that she received the ineffective assistance of counsel because her attorney at trial "opened the door" for the petitioner's incriminating statements to be admitted into evidence at trial. The post-conviction court denied her request for relief after a hearing on the petition. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed her petition. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

David H. Crichton, Elizabethton, Tennessee, for the appellant, Connie Hughes.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony W. Clark, District Attorney General; and Kenneth C. Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

1

# OPINION
## I. Facts
### A. Trial

This case arises from the Petitioner's participation in the murder of Roberta Woods. On direct appeal, our Court summarized the underlying facts of the case as follows:

> Roberta Woods, the victim, was last seen alive by family members on January 14, 2003, at her father's residence in Carter County. The victim's badly decomposed remains were found within the frame of a waterbed in the [Petitioner's] residence on December 13, 2003. The [Petitioner's] residence was a double-wide trailer which she rented from the victim and the victim's sons.

> After the victim's disappearance, the [Petitioner] was interviewed by police. She related that the victim had left her car at the [Petitioner's] residence on January 14 and that the [Petitioner] had taken her home. The [Petitioner] also acknowledged that on the afternoon of January 14, she had met a coworker in Elizabethton to lend the coworker $100. Later that day, the [Petitioner] bought a new cooking stove at an appliance store in Elizabethton. The [Petitioner] used the victim's credit card to purchase the stove, which was the basis of the forgery indictment. The [Petitioner] said she returned the victim's cell phone to the victim's house that afternoon and left a note for the victim. The [Petitioner] said she had no idea of the victim's whereabouts and expressed on many occasions great concern for the victim's welfare to the victim's family, friends, and acquaintances.

> The room in which the victim's body was found was maintained by the [Petitioner] as a "shrine" to her deceased teenage son. During some informal walkthrough inspections by the victim's family and by law officers after the victim's disappearance, the [Petitioner] denied access to this room.

> The victim's body was eventually found by two of the victim's sons. They had entered the residence believing that the [Petitioner] had moved. Dr. Lee Jantz, a forensic anthropologist, stated that the body was fully clothed and wrapped in a rug. The body was decomposed to the point that no identifiable organs remained. Dr. Gretel Case Harlan Stephens, a forensic pathologist, in conjunction with the University of Tennessee anthropological staff, attributed the probable cause of death to a gunshot

2

wound.  This was based on holes in the victim's coat and sweatshirt, which were aligned.  The holes were in the area of the victim's armpit.  An x-ray of the victim's remains detected no metal fragments.

After discovery of the victim's remains, the [Petitioner] was interviewed by Tennessee Bureau of Investigation (T.B.I.) Agent Shannon Morton.  During the first interview on December 13, 2003, the [Petitioner] stated that the victim came to the [Petitioner's] residence, carrying a handgun, on the morning of January 14.  The victim intended to commit suicide and placed the gun to her head.  The [Petitioner] said she struggled with the victim in an attempt to get the gun, and it discharged.  The victim was standing near a loveseat on a blue rug. The [Petitioner] said she did not know where the bullet struck the victim's body but said that it was not in the head.  The [Petitioner] said she checked the victim and did not detect a pulse or signs of breathing.  The [Petitioner] said she did not want the victim's family to know about the suicide.  The [Petitioner] then wrapped the victim in the blue rug and placed the body under the waterbed. She put the victim's purse with the body and did not see the gun so assumed it was with the victim.  In this interview, the [Petitioner] then changed her account to say that her boyfriend, Richard Winters, had come to her residence after the victim was dead.  She said that Winters moved the body to the waterbed.

The [Petitioner] further stated that she took the victim's cell phone to the victim's residence and left it, along with a note to the victim.  Later, she met a coworker and lent her money.  On the same day, the [Petitioner] bought a new stove using the victim's credit card.  According to the [Petitioner], the victim lent her the card the previous week.  Upon the [Petitioner's] return to her home, she called a neighbor to move the stove into her kitchen.  The [Petitioner] said she had not been forthcoming before out of fear that "people would think that I killed [the victim]."

On the following day, the [Petitioner] was again interviewed.  She answered follow-up questions concerning her statement of the previous day.  The [Petitioner] then sought assurances that she would be kept safe in jail from Richard Winters if she told what actually happened.  The [Petitioner] stated that Richard Winters had come to her residence before 11:00 a.m. on January 14. Winters and the [Petitioner] were in her bedroom "getting ready to have sex."  The victim entered the residence, and Winters met her in the kitchen.  The victim and Winters began a heated argument and exchanged

3

threats of killing the other. Winters pulled a small gun from his coat pocket and shot the victim from a distance of approximately six inches. The victim fell against the loveseat. Winters then placed the body within the frame of the waterbed with the assistance of the [Petitioner].

Subsequent to this statement, officers investigated the activities of Winters on January 14. Documentation and testimony were presented at trial showing that Winters had a dental procedure in the early morning on January 14 and later worked with other personnel at the Highway Department office.

Bradley Everett, a T.B.I. agent and forensic scientist, testified that blood stains on the [Petitioner's] loveseat cushion were consistent with the DNA of the victim.

The [Petitioner] did not present proof.

*Connie Hughes*, 2007 WL 1319373, at * 1-3.

As is relevant to the Petitioner's specific claim in this appeal, we summarize pertinent procedural history from her case. During the investigation of the victim's disappearance, the Petitioner gave three written statements to Agent Shannon Morton. The first written statement was given on March 13, 2003, and the second and third statements were, respectively, given on December 13 and 14, 2003. On June 9, 2005, shortly before the Petitioner's June 20, 2005 trial, the trial court granted the State's motion in limine requesting that the December written statements be suppressed. On the fourth day of trial, the State requested a reversal of its motion in limine and the trial court denied this request. Thereafter, Counsel conducted the following cross-examination of Agent Shannon Morton:

Counsel: Now, there was some blood found on a loveseat?

Morton: Yes, sir.

Counsel: And that blood was tested . . .

Morton: That's correct.

. . . .

4

| | |
|---|---|
| Counsel: | To try to confirm if that matched [the victim]? |
| Morton: | Yes, sir. |
| Counsel | And they concluded that it did? |
| Morton: | Yes, sir. |
| Counsel: | Now, the report says that it . . . cannot exclude [the Petitioner] as a contributor, so they compared it to her. |
| Morton: | Not speaking as a DNA expert, but it's my understanding . . . that there were two samples, or two different samples there. One of them being [the victim], and the second one not being able to eliminate [the Petitioner] as potential contributor to that. |
| Counsel: | Okay. It doesn't say whose it is, but, it can't eliminate her? |
| Morton: | Right. |
| | . . . . |
| Counsel: | And during your investigation you found out this was a furnished trailer when her and Richard Winters moved into it years ago. You were aware of that. |
| Morton: | I'm - - I'm not sure I was aware of that. |
| Counsel: | Okay. You don't know how the blood got there on that loveseat? |
| Morton: | No, sir. |
| Counsel: | All right. It could have been there years ago? |
| Morton: | Well, it could have, I suppose. |

Based upon these questions, the State moved to introduce the two previously excluded statements arguing that Counsel had "opened the door to let in that statement about the

5

suicide." The trial court ruled in favor of the State and allowed the previously excluded statements to be admitted.

After hearing all the evidence, the jury convicted the Petitioner of first degree murder, abuse of a corpse, and forgery under $1000. The trial court sentenced her to life imprisonment for the first degree murder and to two concurrent one-year sentences on the remaining convictions.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, claiming that she received the ineffective assistance of counsel. The post-conviction court held an evidentiary hearing, wherein it heard the following evidence:[1] Counsel testified that he had practiced law for seventeen years with the majority of his practice involving the representation of criminal defendants. Counsel had participated in thirty-five to fifty jury trials, fifteen of which were homicide cases. Counsel said that, additionally, he had been death penalty certified for sixteen years.

Counsel testified that he knew the Petitioner from representing her on previous occasions. When the Petitioner was identified as a suspect in this murder case, the Petitioner talked with Counsel, seeking his advice. Upon learning that the Petitioner had already spoken with authorities two or three times, Counsel advised her not to speak with police without having an attorney present. After the victim's body was found in the Petitioner's home, the Petitioner retained Counsel as her attorney in the matter. As soon as Counsel was retained, he notified the Sheriff's Department that there would be "no more statements to anyone. . . . Any contact with her goes through me." Counsel confirmed that all of the written statements that the Petitioner gave to the police occurred before the Petitioner's arrest.

Counsel testified that, after the Petitioner's arrest, he met with her in jail and the Petitioner maintained that the victim was her "best friend" and that she had no motive to kill her. Counsel said that when he asked the Petitioner how the victim's body came to be in her home, the Petitioner responded that she did not know. Counsel said that he did not believe the Petitioner and continued raising this question with the Petitioner as they prepared for trial. Counsel said that the Petitioner "always talked" about Richard

---

[1] In her petition for post-conviction relief, the Petitioner alleged several issues in which Counsel was ineffective. On appeal, however, she maintains only that Counsel "opened the door" allowing her previous statements to be admitted. As such, we will not address claims asserted within the petition for post-conviction relief and testimony concerning allegations of ineffectiveness that the Petitioner does not maintain on appeal.

Winters' involvement and how he did not like the victim. Counsel said that, over time, the Petitioner's statements to Counsel began to mirror her statements to police. Counsel then summarized the transition of the Petitioner's police statements. He said that the Petitioner initially denied any knowledge of where the victim was but expressed concern and that she missed her best friend, the victim. Once the body was found, the statements reflected the Petitioner's assertion that the victim attempted suicide and, finally, that Winters killed the victim and made the Petitioner help him hide the body under the waterbed.

Counsel testified that the defense theory was that the State could not prove that the Petitioner killed the victim. He explained that the long span of time between the victim's disappearance and recovery of the body and the condition of the body once it was found weighed in favor of this defense. Other details also supported this defense theory, such as inconsistencies in the TBI lab report and the pathologist's office, no recovery of the weapon, and the fact that the Petitioner's slight build would have made it difficult for her to wrap the victim's body in a rug, dismantle the waterbed, place the body under the waterbed and then put the waterbed back together. Counsel said that had the State responded to the defense theory by questioning who did it, if not the Petitioner, he was prepared to "point the finger" at Winters.

Counsel testified that he could not recall a specific number of times he met with the Petitioner, but characterized their meetings as "numerous." He said that they initially met "pretty often" and spoke over the phone. Once the Petitioner made bond, they continued to meet, but, after the Petitioner moved to Waynesville, North Carolina with her fiancé, the meetings became less frequent.

Counsel said that he provided a copy of the State's discovery to the Petitioner for her review. The Petitioner wrote letters to Counsel as she reviewed the discovery and then the two discussed the questions over the telephone. During these conversations, Counsel told the Petitioner that the State had a strong case against her due to the victim's body being found in the Petitioner's home under the Petitioner's son's waterbed. Counsel explained that "the troublesome part of that is this room was almost intact as a shrine to her son who [the Petitioner] lost some years before that has always been very near and dear to [the Petitioner's heart]. And the room was almost intact." Counsel said that he explained to the Petitioner the charges and possible punishments for those charges. Counsel recalled the Petitioner's response to his belief that the State had a strong case: "They can't prove their case. They can't prove I killed her. I had no reason to kill her." The Petitioner maintained this position throughout the duration of Counsel's representation.

Counsel testified that the State did not make a plea offer prior to trial, but there was some discussion of an offer for second degree murder during the trial, which the Petitioner declined.

Counsel testified that he prepared the Petitioner to testify. The State then filed a motion in limine asking that the trial court suppress the Petitioner's five previous statements as self-serving, and the trial court granted the State's motion. Based upon the suppression of the Petitioner's statements, Counsel and the Petitioner decided it was a better strategy for her not to testify and subject herself to cross-examination. During the trial, however, when it became clear to the State that the Petitioner was not going to testify, the State asked the trial court to allow the Petitioner's statements to be admitted. The trial court declined the State's request. Thereafter, on the fourth day of trial, the State argued that a question Counsel asked, in reference to a blood stain on the sofa, "opened the door" to the admission of the Petitioner's statements. The trial court agreed and allowed the statements to be admitted.

Counsel said that the admission of these statements came as a "complete surprise." Counsel moved for a mistrial, which the trial court denied, and then Counsel had an "extensive conversation" with the Petitioner about the statements. The Petitioner told Counsel that she did not feel prepared to testify at that time. Counsel told the Petitioner that they could "work on it," but she declined and asked about other options for addressing the statements. Counsel told the Petitioner that she could testify and address the statements or just allow the statements to come in and try to place the blame on Winters. Counsel testified that he did not agree or foresee that his question about a blood stain found on the Petitioner's loveseat would "open the door," allowing the previously suppressed statements to be introduced.

Counsel testified that the Petitioner told him that she and Winters were engaged in an intimate relationship. Winters was either married or had a girlfriend but would "come to see" the Petitioner. The Petitioner told Counsel that, based upon their close friendship, the victim knew that Winters was using the Petitioner, causing conflict between Winters and the victim. Counsel said that the Petitioner told him that, on the day of the victim's murder, Winters "was supposed to have a dentist appointment," so he left work but did not clock out. Instead, he came to her residence and a confrontation ensued between the victim and Winters over the Petitioner. During this confrontation, Winters shot the victim. The Petitioner told Counsel that Winters instructed her to get some plastic and help him wrap the victim's body. The Petitioner said that Winters threatened to kill her if she told anyone about the shooting.

In order to confirm the Petitioner's account of these events, Counsel contacted the

dental office, obtained records from Winters' place of work, and spoke with employees that worked with Winters that day. Some of the employees could not recall whether Winters was at work on the day in question, while others said that Winters came in late to work but was at work all day. Counsel attempted to speak with Winters, but Winters refused. Counsel also reviewed the State's investigation into the Petitioner's account of the event, and the State's investigators concluded that Winters was at the dentist and at work on the day of the murder, excluding him as a suspect. Counsel presented the Petitioner with this information, but she maintained that Winters was at her residence that day.

Counsel testified that, given the change in the course of the trial so late in the proceedings, his only option was to call Winters to the stand, which he did. Counsel said that Winters consistently denied any involvement in the murder. Counsel summarized the evidence introduced supporting the Petitioner's version of the murder as: (1) the Petitioner's statement to police in which she implicated Winters, (2) Winters's testimony acknowledging a relationship with the Petitioner during this time period and that he knew the victim, and (3) employees from Winters' place of work indicating he was gone for a period of time on the day of the victim's disappearance. Counsel explained to the Petitioner that there was "no real evidence" that Winters had committed the murder and again asked if she wanted to testify. The Petitioner declined, saying she did not feel prepared. Counsel offered to take time to prepare her, and the Petitioner declined, saying that it was "too late." Counsel opined that the Petitioner felt unprepared mentally as opposed to unprepared for the content of her testimony.

On cross-examination, Counsel agreed that the testimony at trial was as follows: The victim was at Caraway's residence near the Petitioner's home the morning of the murder. She made a phone call and then left Caraway's residence at around 11:00 a.m. The victim was supposed to be at work by 1:00 p.m., and about a half hour after she left Caraway's residence, Caraway saw her car parked at the Petitioner's home less than half a mile away. At 1:00 p.m., the victim did not report for work, which was out of the ordinary. Her employer became concerned and reported her missing. The victim's car was found later that day in the Petitioner's garage. On that same morning, one of the Petitioner's co-workers called her and asked to borrow a hundred dollars. The Petitioner told her co-worker that she did not have the money at the time but would have it later in the day. Around noon, the Petitioner called the co-worker and arranged to meet her in Elizabethton to give her the money. The Petitioner did so, and later the same day she went to A-1 Appliances and purchased a stove using the victim's credit card. Finally, the evidence at trial showed that the Petitioner took the victim's cell phone with a note expressing concern about the victim to the victim's home and left it. Both police and other persons had occasion to be in the Petitioner's home during the several months of

9

investigation of the victim's disappearance, and the Petitioner consistently denied access to the room where the victim's body was ultimately found. That room was kept very cold. During the investigation, the Petitioner maintained that she knew nothing about the victim's disappearance and expressed concern about the victim. Ultimately, one of the Petitioner's sons allowed police access to the bedroom in the Petitioner's home, where they found the victim's body hidden under a waterbed.

Counsel agreed that, aside from the Petitioner's statements to police, all of this information regarding the murder was presented to the jury. Counsel also agreed that none of it implicated Winters. Counsel stated that, considering the proof absent the statements, this was " a pretty good case" for the State and that all the evidence pointed toward the Petitioner. Counsel agreed that the admission of the Petitioner's statements provided the opportunity to suggest that Winters was the culprit without the Petitioner having to undergo cross-examination.

On redirect, Counsel testified that the two biggest hurdles in this case were that the body was found in the Petitioner's house eleven months after the victim's disappearance and the Petitioner's numerous inconsistent statements to police.

The Petitioner testified that she first contacted Counsel "maybe three or four months after [the victim] supposedly disappeared." The Petitioner told Counsel "what had been going on" and that authorities wanted her to take a lie detector test. The Petitioner said that Counsel advised her not to take the lie detector test but that she decided to take the test anyway, stating she did so because "I didn't kill her." The Petitioner said she had no other contact with Counsel until after her arrest. Counsel met with her in jail and advised her not to talk to anyone. The Petitioner recalled that Counsel became ill after that, so she did not see him for several months after she made bond and was released from jail. When they met, Counsel and the Petitioner discussed the case and Counsel told the Petitioner she should not have made the statements to police. The Petitioner said that she told Counsel that she requested an attorney multiple times and that the police ignored her requests. The Petitioner agreed she signed a waiver of her rights but explained, "I signed a bunch of stuff. I don't even know what half of it was."

The Petitioner testified that she attended the preliminary hearing and agreed that she heard the evidence presented against her. The Petitioner also recalled that Counsel provided her with copies of discovery and that she reviewed these materials. The Petitioner said that, in her conversations with Counsel, he expressed concern over her police statements, inquired about whether anyone else might have seen Winters at her house that day, and began to prepare the Petitioner to testify. The Petitioner said that

10

Counsel never discussed filing a motion to suppress the statements with her. The Petitioner said she anticipated testifying until shortly before her trial when the trial court granted the State's motion to suppress her statements.

The Petitioner testified that she met with Counsel "eight or ten times" and spoke "multiple times" over the phone with him. The Petitioner said that Counsel discussed the possible punishment with her should a jury find her guilty. The Petitioner said that, after the trial had begun, the State extended an offer for the Petitioner to plead guilty to second degree murder. The Petitioner agreed that she did not ask any questions about the offer before declining it. The Petitioner testified that if she had understood more about the plea offer, she would have accepted the offer.

The Petitioner said that, after the trial court ruled that her statements were admissible, Counsel advised her to testify to explain the statements but then he never called her as a witness. The Petitioner said she felt unprepared because she believed she would not be testifying at trial due to the suppression of her statements. The Petitioner denied having told Counsel she would not testify, explaining that she would have testified if he told her to do so.

On cross-examination, the Petitioner agreed that the State's motion in limine requesting the trial court suppress the Petitioner's statements was granted six days before her trial. She agreed that, until that point, Counsel had been preparing her to testify. The Petitioner agreed that, after working with Counsel on her testimony, "to a certain extent" she felt prepared to testify. The Petitioner said that she based her belief that she was unprepared to testify on Counsel's statement to her that she was unprepared to testify.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends the post-conviction court erred when it dismissed her petition. The Petitioner contends that because Counsel "opened the door" to allow the admission into evidence of her previous statements, she received the ineffective assistance of counsel. The State responds that because the Petitioner failed to prove her claim by clear and convincing evidence, the trial court properly denied the Petitioner post-conviction relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her

11

conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House*

12

*v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *See also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *See also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying the Petitioner relief on this issue, the post-conviction court made the following findings:

> *Strickland* requires a reviewing court to evaluate questionable conduct from the attorney's perspective. [Counsel] explained that he felt that the blood on the sofa that he asked Morton about was an issue he needed to address. Who is this court to question [Counsel] on his strategy at that time. Assuming arguendo, the question was inappropriate, and as a

13

result [C]ounsel's representation fell below a reasonable standard. The inquiry would not end here. It would still be necessary that Petitioner satisfy the prejudice prong set out in *Strickland* by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." This is where the argument fails on this issue. Put another way could it be said that the result would be different, had the question not been asked. The answer is no. [Counsel] testified that should the circumstance present itself again he would have still asked the same question. *House* tell[s] us that if a particular strategy or tactic fails or hurts the defense does not, standing alone, establish unreasonable representation.

. . . .

The court has thoroughly reviewed the petition; amended petition and the testimony of [Counsel] and [the Petitioner]; and the court finds no error based on the evidence presented at the Post Conviction hearing. Therefore, [P]etitioner has not proved by clear and convincing proof that she is entitled to post conviction relief.

The evidence in this case does not preponderate against the trial court's findings. Counsel testified at the post-conviction hearing that the defense strategy was to highlight the State's insufficient proof at trial. Prior to trial, the trial court suppressed the Petitioner's statements, and Counsel proceeded on this basis. Counsel testified that he did not believe his question "opened the door" to admission of the Petitioner's previous statements. He explained that the question about the blood on the couch was a strategic decision aimed at attacking the insufficiency of the State's proof against the Petitioner. Counsel's reasoning for asking the question is consistent with the overall defense strategy for the case. As we earlier stated, because a particular tactic fails, it does not, alone, establish unreasonable representation.

Further, as found by the post-conviction court, the Petitioner cannot prove that she was prejudiced. As summarized by Counsel during the post-conviction hearing, the evidence presented against the Petitioner was strong. Notwithstanding the Petitioner's statements, the State introduced evidence that the victim was at the Petitioner's home at approximately 11:00 a.m. on the day of her disappearance and that her car remained at the Petitioner's home until police recovered it. Earlier on the same day, the Petitioner told a co-worker who wanted to borrow money that she did not have the money but that she would have it later in the day. Around noon, the Petitioner contacted the co-worker and

14

arranged to meet to exchange the money. That same afternoon, the Petitioner used the victim's credit card to purchase a stove. During the investigation in this case, the Petitioner denied police access to the bedroom in her home where the victim's body was ultimately found eleven months after the victim's disappearance.

Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show by clear and convincing evidence that Counsel was deficient or that she was prejudiced as a result. Thus, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE